**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

MIKE E. DOSSETT, JR.,                        §
                                             §
          *Petitioner*,                      §
                                             §
v.                                           §          Civil Action No.  SA-08-CA-455-XR
                                             §
NATHANIEL A. QUARTERMAN,                     §
                                             §
          *Respondent*.                      §

**ORDER ON MAGISTRATE JUDGE'S MEMORANDUM & RECOMMENDATION**

On this date, the Court considered the Memorandum and Recommendation filed by
Magistrate Judge John Primomo and Plaintiff's objections thereto, concerning Plaintiff's application
for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging a state prison disciplinary
sanction.  After careful consideration, the Court ACCEPTS the Magistrate Judge's recommendation
and DISMISSES the case.

**I. Background**

Petitioner Mike E. Dossett, Jr. seeks to challenge a jury conviction of murder in Texas state
court in which he claims that his substantive due process rights were violated.  Petitioner alleges that
(1) his attorney rendered ineffective assistance of counsel, (2) the evidence was insufficient, (3) there
was no chain of custody for the sexual assault kit used as evidence, (4) extraneous offence evidence
was improperly admitted, (5) the prosecution failed to produce evidence favorable to the defendant,
(6) his conviction was obtained in violation of his right against self-incrimination, (7) his conviction
was obtained by the use of a coerced statement, and (8) cumulative errors violated due process and
his right to a fair trial. Petitioner asks the Court to provide declaratory and injunctive relief.

On June 6, 1983, Rachel Kosub was found murdered inside her office building in San

Antonio, Texas.[1]  Kosub's body was discovered at approximately 9:30 p.m. after her family became

worried.  She had been sexually assaulted and strangled with her pantyhose.  Her mostly nude body

was found lying face down at the bottom of a staircase with a banister.  Her dress was ripped open,

pulled up over her buttocks and pulled down over her arms, her panties were missing, and her wrists

were crossed behind her back with remnants of adhesive and marks indicating that she had been

bound.  Her pantyhose had been removed, and one leg of her hose had been cleanly cut off with a

sharp instrument, such as a knife, and used as a ligature, which was tightly knotted around her neck.

There were no defensive wounds on her body and no signs of a struggle.  The doors and windows

to the building were locked, and there was no sign of forced entry.  Nothing was missing from the

office, and Kosub's jewelry was still on her body.  Kosub's last known contact with anyone was her

10:30 a.m. phone call to an interior designer to inquire about a ceiling fan catalog for a male

customer who was there in the office.

On June 7, 1983, Dr. Susanna Dana, the assistant medical examiner, conducted the autopsy

and created a sexual assault kit by taking oral, rectal, and vaginal samples from Kosub, along with

hair and fingernail clippings.  She stated she usually makes two to three swabs, and between two and

four slides, for each area.  She retained one set of slides to stain for her own use and sealed the swabs

and the unstained slides inside the kit in separate containers.  Dr. Dana found "abundant sperm" on

the vaginal smear slide, some of which had tails indicating a fairly fresh deposit "within hours."

Some sperm were also found on the rectal slide.  Kosub's cause of death was determined to be

strangulation by ligature.  Based on the extent of rigor mortis and the pattern of lividity, her time of

---

[1]The facts of this case were detailed in by the Texas Fourth Court of Appeals and quoted in
the Magistrate Judge's Report and Recommendation.

death was estimated to be between 10:00 a.m. and noon, and certainly before 5:00 p.m. According to standard procedure, Dr. Dana forwarded the sexual assault kit from the office of the Medical Examiner to the San Antonio Police Department's Crime Lab where Jane Nellis performed a serology analysis on the samples and confirmed the presence of sperm. In 1983, DNA analysis was not being conducted.

In May 1984, based on a tip that Mike Dossett matched a composite sketch of the suspect in an aggravated robbery and attempted sexual assault committed in Live Oak, a community adjacent to the northeastern San Antonio city limits, Officer Gary Hopper and Chief Mark Jackley interviewed Dossett. After Dossett had waived his *Miranda* rights and completed his written confession to the Live Oak offense, and while he was waiting to speak with a Universal City officer about an aggravated sexual assault committed in Universal City, Texas, Dossett asked to speak with his wife and told Officer Hopper that he would then tell him about a dream that had been bothering him for about a year. After Dossett spoke with his wife, he told Hopper about a dream in which he was standing by the banister on a staircase in an office building and looking down at a nude woman laying dead at the bottom of the stairs with her buttocks in the air and her skirt over her face. Recognizing the dream's description as matching the interior of Kosub's office, Officer Hopper felt the dream might be connected to the unsolved Kosub murder on nearby Randolph Boulevard. Hopper contacted the San Antonio Police Department and later transported Dossett to the police station for an interview on the Kosub case. The SAPD investigation into Dossett did not uncover any evidence linking him to Kosub's murder other than his statements about the banister dream[2], and

---

[2]Throughout the trial in state court, Dossett's dream statement was referred to as the "banister dream." For simplicity and consistency, the Court adopts that reference, too.

the Kosub investigation stalled.

In 1995, after Kosub's daughter inquired about the status of the investigation, Detective Tim Britt reviewed the case file and renewed the investigation.  He again interviewed Dossett and obtained samples of his blood, hair, and saliva for DNA analysis.  Britt deposited the samples at the Bexar County crime lab, which was located in the same medical center building as the Medical Examiner's office.  Britt later requested that Dossett's samples be subjected to DNA analysis and compared to the samples in the Kosub sexual assault kit.  Britt was informed by a lab serologist that he could not find the Kosub sexual assault kit and therefore, could not do a comparison.  After speaking with Officer Hopper, Britt re-interviewed Dossett and inquired about the banister dream. Dossett initially stated he "did not really remember" the dream any more, but he agreed that he "probably" recounted that dream to Officer Hopper.  After more discussions, Detective Britt obtained two written statements from Dossett about the banister dream.  In one statement, Dossett described the dream as seeing himself standing by a banister and seeing a dead "girl laying naked all tied up;" he could not see her face; from the staircase he could look out a window.  In the other written statement, Dossett further described the view looking out the window, stating he could see out to the parking lot and could see bushes along the property line, the sun was out and it was not night, and the staircase banister was plain and made of wood.  Dossett states that he has had lots of dreams and admits that "back then there was a part of me that I couldn't control, like part of me is evil.  I could've had a dual personality."  Dossett admitted being inside the interior design business one time around February or March 1983 to ask about a sponsorship for his baseball or softball team.  He thought the secretary was there when he met with the owner.  Dossett denied sexually assaulting and killing Kosub, and the investigation again grew cold.

4

In 2002, Detective George Saidler, who was assigned to the SAPD "cold case" squad, began reviewing and re-investigating the Kosub case.  In 2003, over the span of several months, Detective Saidler inquired at the Bexar County Criminal Investigation Laboratory ("CIL") about the Kosub sexual assault kit.  When he was informed that the kit could not be found at the CIL, Saidler went to the Medical Examiner's offices where, by chance, he ran into the Chief Medical Examiner, Dr. Vincent DiMaio, who had been there since 1981.  Upon being asked about the Kosub kit, Dr. DiMaio easily located the kit in the Toxicology Department's freezer.  Saidler observed Dr. DiMaio remove the Kosub kit and saw that it was sealed.  The kit was submitted to the CIL for DNA testing on April 17, 2003.  The 20-year old samples in the kit were degraded, with mold, fungus, and bacteria present.  However, sufficient genetic material was present to create a DNA profile, and DNA analysis was completed on the swabs.  Male DNA present on the vaginal swab "matched" Dossett's DNA—99.9 % of all other individuals were excluded as the donor.  Dossett was indicted for Kosub's murder twenty years after it occurred.

At trial, Dr. Dana testified about the presence of sperm on Kosub's vaginal swab, as documented in her autopsy report, and Garon Foster, the CIL serologist, testified about the DNA evidence showing that Dossett could not be excluded as the donor of the male sperm on the vaginal swab.  Foster stated that the presence of mold and bacteria on the samples did not alter the DNA profiles but simply had consumed part of the genetic material.  Dr. Dana stated that the presence of mold on the samples did not necessarily mean there was a lapse in protocol because she had seen mold grow even in properly maintained freezers.  Officer Hopper was permitted to testify to Dossett's oral statements to him in 1984 about the banister dream, and Dossett's two written statements about the dream given in 1995 to Detective Britt were admitted into evidence.  Sandra

Murphy described the physical layout of the interior and outside property of the design business, which was similar to Dossett's dream, and testified that Dossett had been at the business three times —once before Kosub's murder regarding a little league sponsorship and twice after her murder looking at carpet and seeking a job. Finally, "other similar crimes" evidence was admitted showing that Dossett had committed the aggravated sexual assaults of Linda Feeley and Mary Jane Chisholm in October 1983 and May 1984 while each was working alone in a small office building in the same area as the Kosub murder scene.

In response, Dossett presented expert DNA testimony by Dr. Robert Benjamin, who opined that the Kosub samples had possibly been contaminated or tampered with during the twenty-year period based on the presence of mold on the samples, bad record-keeping, including the lack of initials on the kit between 1983 and 2003, out-of-date lab procedures used during the 1980s, and the possibility of cross-contamination from a comparison with other sexual assault kits. He based his opinion on his review of the CIL file and did not re-test any of the samples. The only other defense evidence was testimony by a 7-Eleven employee that she had given a statement that at approximately 11:00 a.m. on the day of Kosub's murder, she saw a white pickup truck parked at the business. Dossett's ex-wife testified that he did not own a white pickup truck in 1983.

Petitioner was found guilty of murder by a jury in the 226th Judicial District Court of Bexar County, Texas, and sentenced to forty years.[3] His conviction was affirmed by the Texas Fourth Court of Appeals on August 23, 2006.[4] The Texas Court of Criminal Appeals denied his petition

---

[3]*State v. Dossett*, No. 2003-CR-7652 (226th Dist. Ct., Bexar County, Tex. January 21, 2005).

[4]*Dossett v. State*, 216 S.W.3d 7 (Tex. App.—San Antonio 2006).

for discretionary review on April 18, 2007.[5]

## II. Procedural Background

Petitioner filed a state habeas application under Article 11.07 of the Texas Code of Criminal Procedure.  The Texas Court of Criminal Appeals denied the application on May 7, 2008.  This federal habeas application was filed under 28 U.S.C. § 2254 on May 27, 2008.[6]

## III. Magistrate Judge's Memorandum and Recommendation

Magistrate Judge John Primomo determined that Petitioner should not be granted a writ of habeas corpus for several reasons.[7]  First, Petitioner was convicted based upon sufficient factual and legal grounds through DNA evidence, extraneous offense evidence, Petitioner's dream statement, and eyewitness testimony.  Additionally, the Magistrate Judge found there was no proof that the prosecution failed to disclose favorable evidence or that Petitioner received ineffective assistance of counsel.  The only possible error the Magistrate Judge found was in the prosecution's violation of Petitioner's right to remain silent.  However, the Magistrate Judge believed that it was not so highly prejudicial that it could not be cured with the instruction that was given.  Thus, the Magistrate Judge recommended that the Petitioner's application be dismissed.

## IV. Petitioner's Objections

Petitioner objected to the Magistrate Judge's Memorandum and Recommendation, claiming that the Magistrate Judge was incorrect in that: (1) the Court could only review the facts for legal

---

[5]*Ex Parte Dossett*, No. 04-03-00875-CR, 2004 WL 730739 (Tex. Crim. App. April 7, 2004) (mem. op.).

[6]Pet. for a Writ of Habeas Corpus by a Person in State Custody, June 5, 2008 (Docket Entry No. 1) (the prisoner placed the petition in the prison mailing system on May 27, 2008).

[7]Mem. & Recommendation, Dec. 22, 2008 (Docket Entry No. 14).

sufficiency; (2) the state was improperly given a presumption of correctness; (3) the chain of custody regarding Kosub's sexual assault kit was broken and should warrant an evidentiary hearing; (4) there was no basis for the State introducing extraneous evidence; (5) the presence of a white truck exonerates Petitioner because he never owned a white truck; (6) admission of the dream statement was contrary to Petitioner's Fifth Amendment rights; (7) there is no DNA evidence that links Petitioner to the cause of death; (8) the prosecution withheld exculpatory evidence; and (9) there was ineffective assistance of counsel.[8]   The Court will address each issue in the order of Petitioner's Objections.

## V. Standard of Review

Since there was a timely objection to the Magistrate Judge's Memorandum and Recommendation, the Court reviews the Magistrate Judge's recommended disposition *de novo*.[9] Such a review means that the Court will examine the entire record and will make an independent assessment of the law.

For a state prisoner to obtain relief with respect to a claim adjudicated on the merits in state court, a prisoner must show that the adjudication (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly-established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  A decision is contrary to clearly-established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court

---

[8]Petitioner's Objections to Mem. & Recommendation, Jan. 26, 2009 (Docket Entry No. 21).

[9]28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; L.R. CV-72 (W.D. Tex.).

decides a case differently than the Supreme Court on a set of materially indistinguishable facts.[10] It is not enough that the state court applied clearly-established federal law erroneously or incorrectly.[11] This Court must determine if the state court's application of clearly-established law was objectively unreasonable.[12]

## VI. Analysis

### A. Sufficiency of the Evidence

For Petitioner to succeed on his factual sufficiency challenge, he must prove that, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[13] This essentially means that the Court must look at the evidence and if this Court finds legally sufficient evidence, the verdict must be upheld. The Magistrate Judge was correct in his scope of review.

In this case, there is a sufficient quantity of evidence to support the jury's conviction. There was DNA evidence that linked Dossett to the crime; Dossett's oral and written statements about his banister dream showed his personal knowledge with the crime scene, including details not released to the public; and the evidence was probative of his intent to kill Kosub. Moreover, there was no absolutely exculpatory evidence that would negate one of the critical elements of the crime.[14] The

---

[10]*Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

[11]*Id*. at 411.

[12]*Id*. at 409.

[13]*Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

[14]*See infra* Part VI.E.

jury's verdict is supported at least by some evidence and therefore cannot be vacated for a lack of sufficiency.

## B. State's Presumption of Correctness

Petitioner, throughout his objections, claims that it is wrong for the State to have the presumption of correctness and that doing so deprives him of his due process rights.[15]   Petitioner's due process rights are not violated for giving the State the presumption of correctness during a Habeas review.   Petitioner was entitled to the presumption of innocence *during his trial*, however, when a guilty verdict was returned, the burden of proof shifted to Petitioner.[16]   All reasonable inferences and all credibility determinations must also be considered in the light most favorable to the verdict.[17]   Once there is a jury conviction, the Court gives the utmost deference to the trier of fact. Therefore, the Magistrate Judge was correct in giving the State the presumption of correctness.

## C. Alleged Broken Chain of Custody

Petitioner then challenges that there was a break in the chain of custody of the Kosub rape kit.[18]   In this case, the rape kit was properly admitted into trial.   There was a pretrial hearing on Petitioner's motion to suppress the rape kit for a lack of a chain of custody.   However, as described by the Texas Court of Appeals,[19] the trial court reasonably found that the State established the

---

[15]*See, e.g.,* Petitioner's Objections at 8 & 13.

[16]*Perez*, 529 F.3d at 594.

[17]*Ramirez v. Drake*, 398 F.3d 691, 695 (5th Cir. 2005).

[18]Petitioner's Objections at 7.

[19]*Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006).

10

beginning and the end of the chain of custody as required by Texas law.[20]  As the State properly established the beginning and the end of the chain of custody, the evidence was properly admitted. The mere possibility of a break in that chain does not render the physical evidence inadmissible; it raises the question of the weight to be accorded by the jury to the sufficiency of the proof of a chain of custody.[21]  A jury is free to choose among any reasonable constructions of the evidence and retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.[22] Therefore, the jury is permitted to make its own interpretation on the evidence and doing so is not an unreasonable application of clearly-established federal law.

**D. Extraneous Evidence**

An extraneous offense may be admitted into evidence without violating the Due Process Clause if the Government makes a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense.[23]  Petitioner admits to the Feeley and Chisolm offenses but challenges their admission into evidence based on what he perceives as a lack of similarity.[24]  To prove that the offenses are rationally related, all the Government must do is show the similarities between the extraneous offenses.[25]

In this case, the evidential similarities are overwhelming.  All three victims were found in

---

[20]*Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989).

[21]*United States v. White*, 569 F.2d 263, 266 (5th Cir. 1978).

[22]*United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001).

[23]*Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).

[24]Petitioner's Objections at 9.

[25]*Wood*, 503 F.3d at 414–15.

11

a business office.  Dossett would enter the office, pretending to be there on some legitimate business purpose.  All crimes involved the use of a sharp object, presumably a knife.  Lastly, all three women were bound, undressed, and sexually assaulted.  These three crimes are rationally related and the admission of the previous crimes did not violate the Due Process Clause.  The jury was properly instructed that the evidence may only prove identity of the perpetrator, and given the presumption that jury instructions are followed,[26] it is presumed that the jury only used the evidence with regard to identification.  Given this presumption, the admission of the evidence was not an unreasonable application of clearly-established federal law.

**E. Evidence of the White Truck**

Petitioner alleges that the eyewitness testimony of the store clerk regarding a white truck exonerates him.[27]  This is not the case.  The mere presence of a white truck around the possible time of the killing does not mean that the white truck belonged to the murderer.  Furthermore, Petitioner has not provided evidence that he had absolutely no access to a white truck that day.  The jury is permitted to discern what the evidence proves or disproves,[28] and clearly in this case, they determined that it was not exculpatory.

**F. Petitioner's Fifth Amendment Rights**

Petitioner also challenges the admission of his banister dream statement, claiming it was a violation of his Fifth Amendment rights.  The banister dream statement was volunteered following a custodial interrogation in which Petitioner was read his *Miranda* rights.  Volunteered statements

---

[26]*United States v. Burns*, 526 F.3d 852, 858 (5th Cir. 2008).

[27]Petitioner's Objections at 17.

[28]*Loe*, 262 F.3d at 432.

of any kind are not barred by the Fifth Amendment, including statements voluntarily made to police officers while in custody.[29]  As such, the Petitioner's Fifth Amendment rights were not violated by the admission of the banister dream.

The Petitioner also challenges the prosecution's reference to Petitioner's silence about the crime.  The Fifth Amendment forbids comment by the prosecution on the accused's silence.[30]  Although this is error, it is subject to the test for harmless error.  The test for harmless error is whether the error had substantial and injurious effect or influence in determining the jury verdict.[31]

In this case, a response by Detective Richard Urbanek to a question as to whether he was able to record Dossett's statement about the banister dream is not a violation of the Petitioner's Fifth Amendment rights, and even if it was, it would be harmless error.  When the statement was made during the trial, the Petitioner properly objected to it, and the Judge gave the jury an instruction to disregard the statement.  Again, when a jury is given an instruction, it is presumed that the instruction will be followed.[32]  As Petitioner provides no evidence as to how the instruction was not followed, the presumption stands.  Moreover, even if the Court did find it to be an error, the error was harmless.  It would have had no substantial or injurious effect or influence on the jury given the overwhelming evidence against Petitioner.  Therefore, admitting the evidence and providing a jury instruction to disregard the unconstitutional testimony was not an unreasonable application of clearly-established federal law.

---

[29]*United States v. Taylor*, 237 Fed. App'x 981, 983 (5th Cir. 2007).

[30]*United States v. Martinez-Larraga*, 517 F.3d 258, 266 (5th Cir. 2008).

[31]*Jordan v. Hargett*, 34 F.3d 310, 315 (5th Cir. 1994).

[32]*Burns*, 526 F.3d at 858.

**G. Evidence Linking Petitioner to the Cause of Death**

Petitioner argues that there was no DNA evidence linking him to the cause of death for Kosub.[33]   However, this Court finds there was a significant amount of evidence to support the conviction.   First, there is DNA evidence that puts Petitioner at the scene of the crime to the exclusion of 99.9% of all other people.   Second, the description of Petitioner's banister dream was remarkably similar to the actual crime scene and included information that had not been released to the public.   There is circumstantial evidence that Petitioner murdered Ms. Kosub.   The jury gets to interpret the evidence and give it the weight it sees fit.[34]   Clearly, in this case, the jury believed there was sufficient evidence to warrant a conviction for murder, even with the use of circumstantial evidence.

**H. Alleged Witholding of Evidence by the Prosecution**

Petitioner argues that the prosecution withheld evidence.[35]   Dossett fails identify this evidence.   He merely concludes there is evidence that the prosecution failed to provide him.   Such conclusory statements do not warrant granting a Writ of Habeas Corpus.[36]

**I. Alleged Ineffective Assistance of Counsel**

Finally, Petitioner argues that he received ineffective assistance of counsel.[37]   For habeas relief on a claim of ineffective assistance of counsel, the Petitioner must demonstrate that his counsel

---

[33]Petitioner's Objections at 18.

[34]*Loe*, 262 F.3d at 432.

[35]Petitioner's Objections at 19.

[36]*Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

[37]Petitioner's Objections at 24.

14

was below an objective standard of reasonable assistance and that the deficiency prejudiced his defense.[38]   Judicial scrutiny of counsel's performance must be highly deferential; a reviewing court should make every effort to eliminate distorting effects of hindsight and to evaluate conduct from counsel's perspective at the time.[39]

Petitioner's counsel, Ms. Kerrisa Chelkowski, filed an affidavit in response to Petitioner's claims in state court.  She stated that she spoke to Petitioner's wife and trial lawyers many times and communicated with Petitioner on numerous occasions.  She also kept him advised of legal developments, providing him with copies of briefs and court opinions.  She pursued issues on appeal that she believed were the strongest points, including the admissibility of the DNA and extraneous offense evidence.  The state habeas court accepted Chelkoski's statements in its factual findings. Petitioner provides no evidence as a basis for how his counsel was below the objective standard for reasonable assistance.  The mere brevity of consultation time alone cannot support an ineffective assistance claim unless the defendant can show what additional evidence could have been produced had additional conversations taken place.[40]   Petitioner cannot produce any evidence as to his ineffective assistance of counsel claim.  The finding by the state court that there was no ineffective assistance of counsel was not an unreasonable application of clearly-established federal law.

**J. Cumulative Error**

As this Court finds there is no error committed by the state court, there is no cumulative effect that would warrant granting a writ of habeas corpus.

---

[38]*Gray v. Lynn*, 6 F.3d 265, 269 (5th Cir. 1993).

[39]*United States v. Nguyen*, 504 F.3d 561, 575 (5th Cir. 2007).

[40]*Murry v. Maggio*, 736 F.2d 279, 282–83 (5th Cir. 1984).

## VIII. Conclusion

For the foregoing reasons, the recommendation of the Magistrate Judge is ACCEPTED.  The

Petitioner was found guilty by a jury in state court and has presented no evidence as to why that

conviction should be vacated.  Dossett's Petition for Writ of Habeas Corpus is DISMISSED and the

certificate of appealability is DENIED. The Clerk is directed to close this case.

It is so ORDERED.

SIGNED this 8th day of June, 2010.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

16